| | |
|---|---|
| RONALD MCCLARY, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ELLA DIXIE, et al., ) <br> ) <br> Defendants. ) <br> _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment. [Doc. 66].

## I. PROCEDURAL BACKGROUND

On July 19, 2018, the Plaintiff Ronald McClary ("Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 against Defendants Ella Dixie, identified as a nurse at Lanesboro Correctional Institution ("Lanesboro"), and John Herman McKie, identified as a dietician at Lanesboro, for the violation of his civil rights while incarcerated at Lanesboro in Polkton, North Carolina.[1] [Doc. 1]. Plaintiff claims that Defendants, "while acting in their official capacity[ies] did willfully engage in deliberate

---

[1] Plaintiff is now housed at Tabor Correctional Facility in Tabor City, North Carolina.

indifference [in] violation of [the] 8th Amendment." [Id. at 2]. In his Complaint, which Plaintiff submitted under penalty of perjury, Plaintiff alleges that he sent "many request[s]" to Nurse Dixie "concerning many medical issues" and that Nurse Dixie is responsible for inmates being seen for medical care. [Id.]. Plaintiff alleges that due to his not being seen in response to his sick calls for "2 or 3 or 4 or 5 months" his medications were delayed, and he suffered from urinary outlet obstruction, discomfort, pain, and a urinary tract infection. [Id. at 3, 4]. As to Dietician McKie, Plaintiff claims that McKie denied and delayed in approving Plaintiff's special diet, which he has been on for ten years and which helps treat Plaintiff's high blood pressure. [Id. at 2-3]. Plaintiff alleges that due to McKie's actions, Plaintiff was forced to eat a regular diet "for a time," which caused stomach problems, "higher blood," and pre-diabetes. [Id. at 3]. For relief, Plaintiff seeks compensatory and punitive damages. [Id. at 6].

Plaintiff does not allege when the conduct underlying his claims occurred. [See Doc. 1]. With his Complaint, however, Plaintiff filed copies of prison grievances he submitted in relation to the claims here. [Doc. 4]. Plaintiff submitted a grievance on August 4, 2015 related to the alleged lack of timely medical care. In this grievance, Plaintiff stated that he had written Nurse Dixie and "Lead Nurse Hopkins many times many request[s] to no

2

avail." [Id. at 4]. Plaintiff appealed this grievance through Step Three. [Id. at 5-6]. On September 14, 2015, Plaintiff filed another grievance. [Id. at 1]. In this grievance, Plaintiff complained that he needs to be on the "MNT-4 special diet" because he has lost 20 pounds due to inadequate nutrition from his current diet. [Id.]. Plaintiff complained that he had requested the nutritional assessment form and name of the dietician from Nurse Dixie and Nurse Hopkins, but that this request had gone unanswered. [Id.]. Plaintiff also appealed this grievance through Step Three. [Id. at 3].

Plaintiff's Complaint survived initial review based on his claims of deliberate indifference to his serious medical needs under the Eighth Amendment. [Doc. 9]. On September 25, 2020, Defendants moved for summary judgment. [Doc. 66]. Defendants argue that they are entitled to summary judgment because Plaintiff's claims against Nurse Dixie are barred by *res judicata* and collateral estoppel,[2] because they have sovereign

---

[2] Plaintiff has filed at least two previous actions regarding allegedly inadequate medical care at Lanesboro around or during the relevant times. On February 18, 2015, Plaintiff filed an action against Dr. Anthony Searles, which he later amended to include Nurses Dixie and Hopkins, among others, as Defendants. [Civil Case No. 3:15-cv-00077-FDW, Docs. 1, 12]. This action was dismissed without prejudice for Plaintiff's failure to exhaust administrative remedies. [Id., Doc. 88]. On February 22, 2016, Plaintiff filed an action against Nurse Hopkins, which he later amended to include Dr. Searles and others as Defendants. [Civil Case No. 3:16-cv-00088-FDW, Docs. 1, 39]. This second case involved allegations that Nurse Hopkins and Dr. Searles failed to treat Plaintiff's medical conditions from January 2015 through April 2016. [See id.; Doc. 39]. Eventually this second case was dismissed on the merits. [Id., Doc. 112].

3

immunity and qualified immunity against Plaintiff's claims, and because the record shows that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. [See Doc. 67].

In support of their summary judgment motion, Defendants submitted a memorandum; their own Declarations; an Affidavit of Anthony Searles, M.D.; and Plaintiff's movement log and medical records. [Docs. 68-1 through 68-10]. Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 69]. Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be

> submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff has submitted nothing in response to Defendants' summary judgment motion, despite having been granted an extension of time to do so. [See Doc. 70; 10/13/2020 Docket Entry]. Because Plaintiff's Complaint was submitted under penalty of perjury, however, it is considered an affidavit for summary judgment purposes. See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) (holding the district court erred in failing to consider a prisoner plaintiff's verified, though superseded, complaints as affidavits on summary judgment). The Court will, therefore, consider its evidentiary value here. Id.

This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).

7

Case 3:18-cv-00395-MR   Document 71   Filed 04/02/21   Page 7 of 19

## III. FACTUAL BACKGROUND

The uncontroverted forecast of evidence in the light most favorable to the nonmovant is as follows:

Nurse Dixie, a board-certified registered nurse since 1982, began working for the North Carolina Department of Public Safety (NCDPS) in 2001. [Doc. 68-1 at ¶¶ 2-3: Dixie Dec.]. On December 12, 2014, Nurse Dixie was promoted to Regional Nurse Supervisor for the Western Region of North Carolina. Nurse Dixie was in that position until she retired in April 2016. In March 2015 and in the fall of 2015, Nurse Dixie underwent surgery. Both procedures required physical therapy. As a result, Nurse Dixie was based in Scotland Correctional Institution during that time to be closer to home and her physical therapist. [Id. at ¶ 4]. One of Nurse Dixie's duties as Regional Nurse Supervisor was to staff the facilities in the Western Region with nurses. [Id. at ¶ 5]. If a Nurse Supervisor position at a particular facility needed to be filled, Nurse Dixie would sometimes fill in. When Nurse Dixie was acting as Nurse Supervisor at a particular facility, it was not her responsibility to schedule the nurses there. Rather, the scheduling was performed by the Lead Nurse. [Id. at ¶ 6]. Furthermore, when Nurse Dixie filled in as Nurse Supervisor, she was not responsible for administering medication or providing direct healthcare to inmates, except when a "code"

was called, and emergency care was required. [Id. at ¶ 7]. Nurse Dixie did not see inmates on sick call. [Id.].

Pursuant to NCDPS policy and procedures, all inmates can access routine healthcare, including medical, dental, and mental health care, through the sick call process. Sick call forms are readily available in all inmate-housing areas and upon request. Sick call requests are then routed to the appropriate healthcare provider and individual appointments are scheduled. [Id. at ¶ 10].

Nurse Dixie reviewed Plaintiff's medical records, which are maintained by the NCDPS, covering the period of December 12, 2014 to April 27, 2016. [Id. at ¶ 9]. This review confirmed Nurse Dixie's memory that she did not see Plaintiff in a clinical setting during that time. Nurse Dixie was never his primary, triage, or treating nurse. [Id. at ¶ 13]. Moreover, Nurse Dixie did nothing to impede Plaintiff's access to medical care or to employ the sick call procedure. [Id. at ¶ 14]. Plaintiff's records reflect that at no time was he denied the level of care deemed medically necessary to address his complaints. Rather, they show that that Plaintiff was referred to physicians and physician extenders on a regular basis. [Id. at ¶ 16]. There is also no indication that Plaintiff's medical needs, including his medications, were

denied, or even delayed.[3] [Id. at ¶ 17; see id. at ¶ 24]. Nurse Dixie does not recall ever receiving a request directed to her from Plaintiff relating to a delay in his receiving medications. [Id. at ¶ 18]. Moreover, the medical records do not support Plaintiff's contention that his medical conditions worsened appreciably while he was incarcerated at Lanesboro, as he alleged.[4] [Id. at ¶ 20].

Dietician McKie, a Registered Dietician licensed in the State of North Carolina, earned a master's degree in clinical nutrition in 2004. [Doc. 68-2 at ¶¶ 2-3: McKie Dec.]. In 2013, McKie became a regional dietician for the NCDPS. [Id. at ¶ 5]. Since 2015, McKie has assisted the Western Regional Dietician, handling recruitment for food services and special projects. [Id. at ¶ 6].

---

[3] Plaintiff filed a substantial number of sick call requests during the relevant time, which based on the dates of Plaintiff's relevant grievances and the date of the filing of Plaintiff's Complaint for limitations period purposes, was between July 19, 2015 and September 14, 2015. [See Doc. 68-10]. (Giving Plaintiff the benefit of every reasonable inference and based on his claims of delay in receiving medical care for a period up to five months, the Court considers Plaintiff's medical records from February 2015 to September 14, 2015.). Plaintiff's complaints in these numerous sick call requests were addressed within a reasonable time, particularly given the volume of Plaintiff's requests for medical care and the nature of Plaintiff's complaints. [See id.].

[4] While Plaintiff alleges that he sent "many requests" for medical care to Nurse Dixie, who he alleges was responsible for ensuring that he be provided medical care, and that his care and medications were delayed for months, the medical record and other forecast of evidence plainly refutes Plaintiff's claims and wholly fails to support Plaintiff's direct allegations against Nurse Dixie. The Court, therefore, cannot consider Plaintiff's allegations on summary judgment. See Scott, 550 U.S. at 380, 127 S.Ct. at 1776.

The Health Services Policy & Procedure Manual Care and Treatment of Patient – Restrictive Procedures Section (the "Meal Policy") sets forth the policy for special management meals. [Id. at ¶ 9]. The Meal Policy states that the "responsible facility provider must determine whether or not the special management meal is appropriate." [Id. at ¶ 10 (citing Meal Policy I.B.2)]. The "provider" is a medical doctor, a physician assistant, or a nurse practitioner, not a registered nurse or a clinical dietician. [Id. at ¶ 11]. In determining whether a special management meal is appropriate, the general procedure is as follows. Based on a visit or non-patient contact, a provider requests a nutritional consultation via the Healthcare Electronic Record for Offenders ("HERO") database. A dietician then completes the nutritional assessment in the Food Management System and loads the assessment to the provider's queue in HERO for review and approval. The provider orders the recommended diet or enters a diet of their choosing in HERO. Then, medical staff assigned to administer the special management diet reviews the provider's order with the offender, provides nutrition education, and provides the offender a letter detailing the diet with start and expiration dates. The dietician does not control the scheduling of offenders to receive a new diet order or changes to a current diet order. [Id. at ¶ 12].

During the times relevant to Plaintiff's action, Lanesboro did not have an assigned dietician. [Id. at ¶ 2]. As such, from time to time, McKie was asked to assist with dietary consultations for inmates there. [Id. at ¶ 14]. McKie completed a nutritional consultation request for Plaintiff from Nurse Bradford on June 2, 2015. [Id.]. McKie loaded the completed consult in HERO the same day for approval by Dr. Haynes. [Id.]. Based on the diagnosis of gastroesophageal reflux disease (GERD), McKie recommended the low fat, bland diet for six months. Plaintiff refused this diet. [Id.]. On December 2, 2015, McKie completed another nutritional consultation request for Plaintiff from Nurse Practitioner Veronica Southerland. McKie loaded the completed consult in HERO on December 4, 2015. Based on diagnoses of hypertension and GERD, McKie recommended the low fat, low sodium MNT 3 no snack diet for twelve months. McKie recommended this diet because it is therapeutic for hypertension and GERD and it exceeded Plaintiff's estimated caloric requirements. When McKie made this recommendation, Plaintiff's weight was listed as 173 pounds, a healthy weight for Plaintiff's height. [Id.]. Again, the provider, not McKie, made the final decision

regarding Plaintiff's nutritional plan. [Id. at ¶ 15]. McKie has not been involved in Plaintiff's care since December 2015.[5] [Id. at ¶ 16].

## III. DISCUSSION

Defendants argue that they are entitled to summary judgment because Plaintiff's claims against Nurse Dixie are barred by *res judicata* and collateral estoppel, because they have sovereign immunity and qualified immunity against Plaintiff's claims, and because the record shows that Defendants were not deliberately indifferent to Plaintiff's serious medical needs.

### A. Sovereign Immunity

Plaintiff sues Defendants for conduct occurring while Defendants were acting in their official capacities only.[6] [Doc. 1 at 2]. A suit against a state official in his official capacity is construed as against the state itself. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). It is well settled that neither a state nor its officials acting in their official capacities are "persons"

---

[5] Plaintiff alleges that McKie denied and delayed in approving Plaintiff's special diet, which Plaintiff claims resulted in stomach issues, higher blood pressure, and pre-diabetes. Again, however, the forecast of evidence, including Plaintiff's medical record, does not reflect any delay or denial of a special diet by Dietician McKie but rather that McKie acted promptly in completing two dietary consultations for Plaintiff and that Plaintiff's medical provider was ultimately responsible for ordering and implementing any special diet. The Court, therefore, cannot consider Plaintiff's allegations for evidentiary purposes here. See Scott, 550 U.S. at 380, 127 S.Ct. at 1776.

[6] Defendants do not argue that Plaintiff's claims were limited to Defendants' official capacity only. As such, for the sake of a complete record, the Court will address Plaintiff's claims as though they were also asserted against Defendants in their individual capacities.

subject to suit under 42 U.S.C. § 1983. Id.; see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978). Moreover, the Eleventh Amendment generally bars lawsuits by citizens against non-consenting states brought either in state or federal courts. See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996).

Although Congress may abrogate the states' sovereign immunity, it has not chosen to do so for claims under 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 343 (1979). Likewise, North Carolina has not waived its sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C. § 1983. See generally, Mary's House, Inc. v. North Carolina, 976 F.Supp.2d 691, 697 (M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North Carolina). As such, Defendants are entitled to summary judgment on Plaintiff's claims, which were asserted against Defendants in their official capacities only. The Court will, therefore, grant Defendant's Motion for Summary Judgment on this ground.

### B. Eighth Amendment

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429

U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). Further, the constitutional right is to

15

medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

To succeed on a claim against Defendants under the Eighth Amendment, Plaintiff must show a deliberate indifference to Plaintiff's serious medical needs. Estelle, 429 U.S. at 104. To establish such indifference, the "treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851. Absent exceptional circumstances, a disagreement between a prisoner and a healthcare provider over the prisoner's proper medical care is not grounds for a § 1983 claim. Wright, 766 F.2d at 849.

Here, as to Nurse Dixie, the forecast of evidence does not show that she knew of or disregarded any of Plaintiff's serious medical needs. See Young, 238 F.3d at 575-76. Nurse Dixie did not treat Plaintiff and was not

16

Case 3:18-cv-00395-MR   Document 71   Filed 04/02/21   Page 16 of 19

responsible for his medications. Nor was Nurse Dixie responsible for ensuring that Plaintiff's sick call requests were answered. Even if Nurse Dixie were somehow responsible for Plaintiff's timely medical care, the forecast of evidence reflects that Plaintiff's many complaints were addressed and treated within a reasonable time. There is simply no forecast of evidence to support Plaintiff's Eighth Amendment claim against Nurse Dixie. The Court will, therefore, grant summary judgment for Nurse Dixie.[7]

As to Dietician McKie, the relevant forecast of evidence shows, at best, a disagreement between Plaintiff and the provider who ultimately ordered Plaintiff's diet plan based on McKie's June 2015 diet recommendation. At that time, McKie recommended a low fat, bland diet for six months. Plaintiff refused this diet, apparently because he believed that he needed the MNT-4 special diet instead. A disagreement between an inmate and a physician over the inmate's proper medical care does not support a § 1983 claim absent the showing of exceptional circumstances. Wright, 766 F.2d at 849. There is no forecast of evidence supporting any such exceptional

---

[7] Defendant Dixie also argues that Plaintiff's claim against her is barred by *res judicata* and collateral estoppel because Plaintiff's previous lawsuit against Nurse Hopkins and Dr. Searles, Case No. 3:16-cv-88, also involved the alleged lack of adequate medical care at Lanesboro at the relevant times. [See Doc. 67 at 11-13]. Because Plaintiff's claim against Nurse Dixie fails on the merits in any event, the Court declines to address this argument.

circumstances here. As such, there is no genuine issue for trial on Plaintiff's claim against McKie and the Court will grant summary judgment accordingly.

## C. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not presented a forecast of evidence that Defendants violated a constitutional right, Defendants would be entitled qualified immunity on individual capacity claims, had Plaintiff asserted such

against them. Therefore, the Court would have granted summary judgment on this ground as well.

## IV. CONCLUSION

For the reasons stated herein, the Defendant's Motion for Summary Judgment will be granted.

## **O R D E R**

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 66] is **GRANTED** and this action is hereby **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

Signed: April 2, 2021

Martin Reidinger
Chief United States District Judge